**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF TEXAS, SAN ANTONIO DIVISION**

| | |
|---|---|
| TEXAS LAUREL RIDGE HOSPITAL, LP d/b/a LAUREL RIDGE TREATMENT CENTER | ) ) ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) Civil Action No. 5:26-cv-2701 |
| | ) |
| ROBERT F. KENNEDY, JR., SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, | ) ) ) ) |
| | ) |
| DR. MEHMET OZ, ADMINISTRATOR OF THE CENTERS FOR MEDICARE AND MEDICAID SERVICES, | ) ) ) |
| | ) |
| AND | ) |
| | ) |
| TEXAS HEALTH AND HUMAN SERVICES COMMISSION | ) ) |
| | ) |
| **Defendants.** | ) |

**<u>VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>**

COMES NOW Plaintiff Texas Laurel Ridge Hospital, L.P. d/b/a Laurel Ridge Treatment

Center and for its cause of action states:

**I. <u>NATURE OF THE CASE</u>**

1.      Plaintiff Texas Laurel Ridge Hospital, L.P. d/b/a Laurel Ridge Treatment Center,

(hereinafter "Laurel Ridge," "Facility," or "Plaintiff"), is a psychiatric hospital in San Antonio,

Texas, that treats thousands of patients including children and active-duty military personnel. It is

the largest psychiatric hospital in Texas and currently employs over 650 employees. The

Defendants propose to terminate Laurel Ridge from participating in the Medicare Program on only

15-days' notice, based on factually and legally defective survey findings, and without any

1

opportunity for review, in violation of Laurel Ridge's statutory and constitutional rights. If Defendants are not restrained and enjoined from this improper act, Laurel Ridge's Medicare termination takes effect April 30, 2026 and will effectively shutter Laurel Ridge. Laurel Ridge brings this civil action for a temporary restraining order ("TRO") and injunctive relief to prevent Defendants from taking this action imminently.

2.     If Laurel Ridge is terminated as a Medicare provider, any of its inpatients currently receiving critical mental health treatment services as of April 30 will have to be relocated from the Facility (if other facilities are even available to accept them), and Laurel Ridge would be unable to accept patients to provide critical mental health treatment, resulting in irreparable injury to Laurel Ridge, its patients, their families, Laurel Ridge's hundreds of employees, and the San Antonio and surrounding communities.  In order to avoid this serious and irreparable injury, the Facility requests this Court to restrain and enjoin the Secretary from terminating its Medicare participation agreement until the Facility is provided due process of law and the other procedural protections to which it is entitled.

## II. JURISDICTION AND VENUE

3.     This is a civil action under the Medicare Act, 42 U.S.C. §§ 1395, *et seq.*; the Medicaid Act, 42 U.S.C. §§ 1396, *et seq.*; 42 U.S.C. §§ 301, *et seq.* and 42 U.S.C. § 1395ii. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1361, 42 U.S.C. § 405, 5 U.S.C. § 551 *et seq.*, the Court's general equity powers, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and the Constitution of the United States.

4.     Venue is proper under 28 U.S.C. § 1391. Plaintiff is located in San Antonio, Texas, and the events giving rise to this action occurred in San Antonio, Texas.

2

5.      Although the Medicare Act generally channels claims arising under the Act through the administrative process before a provider may seek federal court review, 42 U.S.C. §§ 405(g) and (h), the exhaustion requirement is subject to well-established exceptions that apply here. Under the longstanding precedent of *Mathews v. Eldridge*, 424 U.S. 319, 330 (1976), the exhaustion requirement is waived where: (a) the claimant raises a colorable constitutional challenge entirely collateral to its claim of entitlement; and (b) the claimant's interest in having the issue resolved promptly is so great that deference to the agency's judgment is inappropriate. Both requirements are easily satisfied here.

6.      Laurel Ridge's claims are entirely collateral to the substantive merits of the Defendants' Medicare termination decision. Laurel Ridge raises exclusively procedural and constitutional claims, mainly concerning the complete absence of any pre-termination review mechanism despite the flawed survey process. Laurel Ridge's claims "only require the court to determine how much process is required under the Constitution and federal law" and do "not require the court to wade into the Medicare Act or regulations." *Family Rehab., Inc. v. Azar*, 886 F.3d 496, 503 (5th Cir. 2018); *see also Aurora Chicago Lakeshore Hosp. v. Azar*, 356 F. Supp. 3d 749, 758 (N.D. Ill. 2018) (finding due process and APA claims challenging pre-termination procedures "entirely collateral" from the underlying administrative challenge to termination) (*vacated on other grounds*, No. 18 C 8162, 2019 WL 6911965 (N.D. Ill. Dec. 19, 2019)). Laurel Ridge does not ask this Court to review the results of any survey or to make any ruling as to the appropriateness or substantive merits of Defendants' termination decision—Laurel Ridge is raising those issues in the administrative appeal process that, unfortunately, takes years to resolve.

7.      Plaintiff's interest in having these issues resolved promptly is so great that deference to the agency's judgment is inappropriate. As set forth more fully below, termination of

3

the Facility's Medicare provider agreement will result in the loss of virtually all revenue sources, forcing the closure of the largest psychiatric hospital in Texas, the displacement of hundreds of patients, including children and active-duty military personnel, and the layoff of over 650 employees. The survey process suffers from serious flaws, the administrative appeal process does not stay the termination, and review by an administrative law judge is not expected for years. By that time, the Facility will have ceased to exist, its patients will have been displaced, and its skilled workforce will have dispersed. These harms are not compensable through retroactive payments. *See Family Rehab.*, 886 F.3d at 504 (holding that "combined threats of going out of business and disruption to Medicare patients are sufficient for irreparable injury"); *Aurora Chicago Lakeshore Hosp.*, 356 F. Supp. 3d at 759-60 (finding deference to agency inappropriate where provider demonstrated it would be rendered insolvent and forced to close).

8.      Additionally, requiring Plaintiff to exhaust administrative remedies (which have been initiated) would amount to the practical denial of judicial review. The administrative appeal of a Medicare provider termination does not stay the termination, and the ALJ hearing process takes, on average, *3.3 years* from the close of a survey to issuance of an ALJ decision.

### III. <u>PARTIES</u>

9.      Plaintiff operates a psychiatric facility in San Antonio, Texas, which at all relevant times was licensed and certified to participate in the Medicare Program.

10.     Defendant Robert F. Kennedy, Jr., Secretary of the United States Department of Health and Human Services ("Secretary") is the Secretary of the department which is statutorily responsible for the administration of the Medicare Act, 42 U.S.C. § 1395, et seq., and the administration of federal responsibilities under the Medicaid Act, 42 U.S.C. § 1396, et seq. The Secretary is sued in an official capacity.

11.    Defendant Dr. Mehmet Oz, is the Administrator for the Centers for Medicare and Medicaid Services ("CMS"). CMS is a federal agency organized under the laws of the United States and is the Secretary's designated agent for administering the Medicare and Medicaid Programs and making final administrative decisions with respect to those programs. The Administrator is sued in an official capacity.

12.    Defendant Texas Health and Human Services Commission ("HHSC") is an agency of the State of Texas. HHSC has entered into a contract with the Secretary under which it has been designated as Texas's state survey agency. State survey agencies (known as the "state survey agency" or "SSA") contract with the Secretary to survey hospitals and to make findings and recommendations to the Secretary regarding each hospital's compliance with regulatory Conditions for Participation ("COPs") in the Medicare and Medicaid Programs.

13.    Defendants Secretary, CMS, and HHSC are collectively referred to as Defendants in this pleading.

## IV. STATEMENT OF FACTS

### Services Provided by Laurel Ridge

14.    Laurel Ridge has been in operation since 1987, and under current ownership since 2010.

15.    Laurel Ridge is the largest psychiatric hospital in the state of Texas.

16.    Laurel Ridge is an integral part of the mental health service delivery system in Bexar County, Texas, and surrounding areas.

17.    Laurel Ridge has a total of 330 licensed beds: 208 acute inpatient psychiatric beds; 80 beds dedicated to the military community; and 42 residential treatment center beds for children under the age of 18.

5

18.    Of the 288 acute inpatient psychiatric beds, 26 are for children (ages 5-12); 52 are for adolescents (ages 13-17), and the remainder are for adults.

19.    At all times relevant to this matter, Laurel Ridge's inpatient psychiatric beds were certified for participation in the Medicare and Medicaid programs.[1]

20.    Laurel Ridge has numerous contracts with Medicare Advantage plans, which are private insurance alternatives to traditional Medicare. Providers contracting with Medicare Advantage plans are required to have a Medicare participation agreement. *See* 42 C.F.R. § 422.204(b)(3).

21.    In addition to participating in Medicare and Medicaid, Laurel Ridge has 80 beds dedicated to the military community pursuant to contracts with Humana Military and TriWest Healthcare Alliance, the contractors responsible for management and delivery of services for Tricare, the healthcare program for active-duty service members, retirees, and their families. Both agreements require that contracted healthcare providers have a Medicare participation agreement.

22.    In addition to participating in Medicare, Medicaid, and Tricare, Laurel Ridge also contracts with numerous private commercial payers, all of which require participating providers to be enrolled in Medicare or indicate that involuntary termination by Medicare is a cause for termination of those payer contracts.

23.    In addition to the inpatient services that Laurel Ridge provides to children, adolescents, and adults, Laurel Ridge also provides outpatient services.

24.    In 2025, Laurel Ridge's inpatient admissions totaled 10,340, and it provided outpatient services to a total of 25,484 patients.

25.    Nearly a third of Laurel Ridge's patients are part of the military community.

---

[1] There is no Medicare certification for residential treatment centers for children under 18.

6

26.     Laurel Ridge treats individuals requiring care regardless of ability to pay.

27.     In 2025, Laurel Ridge provided the community $7,162,493 in uncompensated care.

28.     Laurel Ridge continues to perform well against the State of Texas and national Inpatient Psychiatric Facility Quality Reporting (IPFQR) measures which are publicly reported. In 10 of 15 categories analyzed, Laurel Ridge scored at or better than the Texas or national average.

29.     Laurel Ridge patients complete surveys upon completion of their admission. In these surveys, from July 2025 through December 2025, patients report overall satisfaction with their care at the Facility as a 4.4 out of 5. Additionally, patients were asked to score on the statement "I feel better than when I was admitted," and rated at a 4.43 out of 5.  Similar scores were also achieved for these same metrics in a survey from January through June 2024, showcasing consistent positive patient encounters. Laurel Ridge's Net Promoter Score is 48. This score ranges from -100 to +100, with metrics determined by industry benchmarks for customer satisfaction. Overall, a score above 20 is considered good and above 50 is excellent. Laurel Ridge's score of 48—is almost meeting excellence. Lastly, ninety-three percent (93%) of patients indicated improvement on patient reported outcome measurements based upon symptom severity.  These results show Laurel Ridge is achieving a high degree of patient satisfaction when it comes to meeting positive outcomes for patients following discharge.

30.     Laurel Ridge is a major employer in San Antonio. It has over 659 employees and 22 psychiatrists. In 2025, its total payroll was in excess of $48.5 million. Many of these employees and their dependents are covered through facility-sponsored health insurance plans.

31.     In addition to being a major employer, Laurel Ridge supports the community in addressing the significant healthcare workforce shortage by serving as an on-site training location for medical, nursing, and therapy students enrolled in programs through multiple universities,

7

including Galen, University of the Incarnate Word, Chamberlain, University of Texas Arlington, Baylor University, Wayland, West Carolina University, Texas State University, St. Mary's, and Abilene Christian University.

32.     Laurel Ridge also provides training and education for the community at large to improve the mental health service delivery system. On a quarterly basis, Laurel Ridge hosts the Bexar County Mental Health CIT Training and Children's Crisis Intervention Training.  Annually, Laurel Ridge hosts the JBSA Mental Health Providers Training on Ethics, Texas Association of School Resources Conference, and National Case Management Conference. Special training hosted by Laurel Ridge from 2023 to 2026 has included the following:

- Genetics and Mental Health
- Understanding the Impact of Trauma in Memory Formulation and the Development of PTSD
- Male Survivors – Breaking the Gender Stereotypes with MST & The Autonomic Nervous System
- Parenting Seminar – Back to School Anxiety
- Recognizing Eating Disorders & Utilizing Effective Treatment Modalities
- Treatment of Substance Use Disorders
- Hope Restored 2 – ECT Therapy CEU
- Principals of Ethics and Morals
- Ethics of Self-Care for Mental Health Professionals
- Genetics and Mental Health
- Understanding Neurofeedback
- Sculpting and Letter Writing to Address Unspoken Resistance in Couple and Family Therapy
- Music Therapy Vs. Music IN Therapy: How to Incorporate Music in Your Practice
- Ethical Decision Making, Awareness & Sensitivity, Trauma Memory

33.     On top of hosting these community events, Laurel Ridge contributes hundreds of thousands of dollars sponsoring many other community and national mental health events.

34.      Laurel Ridge purchases over $3 million in services from the local community each year, which includes building maintenance services, utilities, medical supplies, and printing for community education and outreach.

35.    Laurel Ridge is also a significant taxpayer in San Antonio, paying over $1 million in property, local, and unemployment taxes in 2025.

36.    Apart from Laurel Ridge, there are only three other standalone inpatient psychiatric hospitals in San Antonio. Collectively, those three facilities have a total of 313 licensed beds (74 of which are exclusively for children). Apart from these standalone psychiatric hospitals, there are four general hospitals in San Antonio that have a collective total of 130 psychiatric beds. Without Laurel Ridge, San Antonio's total of 731 beds will shrink to a total of 443 beds (a loss of nearly 40% in available inpatient psychiatric beds).

37.    San Antonio is the 7th most populous city in the United States. The 2020 census data showed San Antonio had a population of 1,434,625.  For July 1, 2025, the U.S. Census Bureau estimated San Antonio's population to be 2,160,088.

38.    A report in July 2025 showed that Bexar County adults have a higher prevalence of depressive disorder than state and national estimates.

39.    The need for inpatient psychiatric services in the San Antonio area far exceeds the available capacity. According to Mental Health America, a nonprofit that  researches access to care, Texas ranks #50 in access to mental health care. The closure of Laurel Ridge would severely compound the problem, eliminating 288 inpatient psychiatric beds from the San Antonio market, reducing the total available beds by nearly 40%. The remaining facilities in the area lack the capacity, specialized programming, and staffing to absorb the patient volume currently served by Laurel Ridge, particularly with respect to children, adolescents, and active-duty military personnel. The loss of Laurel Ridge's dedicated 80-bed military unit would be especially acute given the proximity of Joint Base San Antonio, one of the largest military installations in the United States,

and the ongoing military engagement in Iran. No other facility in the region offers a comparable dedicated military behavioral health program.

## The Medicare and Medicaid Programs

40. The Medicare Program is a federal health insurance program for the aged, under which qualified health care providers are reimbursed by the federal government for the treatment and care they provide to Medicare Program beneficiaries. 42 U.S.C. §§ 1395c, 1395f.

41. Medicare is the single largest health insurance payer for health care services in the United States.

42. The Medicaid Program is a cooperative state-federal program that provides medical assistance, including hospital coverage, to needy individuals, i.e., those whose income and resources are below certain amounts. *See* 42 U.S.C. § 1396 *et seq.* Both the federal and state governments jointly fund the Medicaid Program.

43. Providers that wish to participate in the Medicare or Medicaid Programs must enter into written "provider agreements" with the Secretary and with the state agency responsible for administering a particular state's Medicaid program.

44. Institutional providers, such as hospitals, that have provider agreements for participation in the Medicare and/or Medicaid Programs must be "certified" for such participation pursuant to federal regulations set forth in 42 C.F.R. §§ 482.1, *et seq*. (Medicare) and 42 C.F.R. §§ 442.1, *et seq*. (Medicaid). Being certified means the provider has been determined to "substantially comply" the COPs, which include numerous physical plant, staffing, resident rights, clinical, and operational requirements.

**The Survey Process**

45.     Hospitals that participate in Medicare or Medicaid are required to be periodically inspected (or "surveyed") to verify they are in "substantial compliance" with the COPs.

46.     Under 42 U.S.C. § 1395aa, the Secretary is authorized to enter into agreements with state agencies (known as "state survey agencies" or "SSAs") to conduct these surveys. The Secretary has entered into such an agreement with HHSC.

47.     Federal regulations and the agreement between HHSC and the Secretary require HHSC to conduct surveys using the survey forms, procedures, and methods prescribed by the Secretary. 42 C.F.R. § 488.318(a)(iii)-(iv).

48.     The certification requirements for hospitals participating in the Medicare or Medicaid Program are prescribed by federal regulations. 42 C.F.R. § 482.1, *et seq*.

49.     CMS has set forth the survey methods, procedures, and forms used to conduct surveys, including those which HHSC used to survey the Facility, in a manual referred to as the "State Operations Manual" (or "SOM").

50.     In addition to setting forth the survey methods, procedures, and forms to be used by state survey agencies, the SOM also includes a number of appendices that detail CMS's interpretations of the COPs for the various provider types. Appendix A of the SOM, which is 611 pages, sets forth CMS's interpretation of the hospital COPs.

51.     The SOM is only one of *thousands of guidance documents* used by CMS in regulating Medicare providers. In 2016, now-United States Supreme Court Justice Neil Gorsuch commented in a Tenth Circuit decision that: "[CMS] estimates that it issues literally thousands of new or revised guidance documents (not pages) every single year, guidance providers must follow exactly if they wish to provide health care services to the elderly and disabled under Medicare's

11

umbrella. Currently, about *37,000 separate guidance documents* can be found on CMS's website—and even that doesn't purport to be a complete inventory." *Caring Hearts Pers. Home Servs., Inc. v. Burwell*, 824 F.3d 968, 970 (10th Cir. 2016) (emphasis added).

52.    The SOM, like many of the manuals used by CMS, has not undergone the notice-and-comment rulemaking process pursuant to the rulemaking requirements in the Medicare Act or Administrative Procedure Act.

53.    Because of the volume of the guidance documents and the fact that they have not undergone the notice-and-comment rulemaking process, there are many outdated provisions, drafting errors, and inconsistencies throughout the documents.

54.    Using these informal guidance documents that have not undergone notice-and-comment rulemaking, surveyors may cite as a "deficiency" any instance in which they determine – by observation, interview, record review, or any other means – that a certified facility has not maintained "substantial compliance" with a regulatory requirement.

55.    Surveyors are often former clinicians, and it is not uncommon for a surveyor to be a rejected applicant or former employee of the very providers they are tasked with surveying. CMS's only limitation is that a surveyor of home health agencies and hospices cannot have worked at the provider being surveyed in the past *two* years, but there is no federal regulation with a similar limitation for hospital surveyors. There is no limitation at all on surveyors surveying a facility from which they were rejected for employment or terminated.

56.    There is no formal mechanism to provide feedback on SSAs or surveyors, or to report surveyor misconduct.

**Hospital Surveys**

57. Hospitals participating in Medicare or Medicaid must undergo a full, regular survey every three years.

58. In addition to a full, regular survey every three years, hospitals may be surveyed in response to complaints made by any member of the public, which can be done anonymously by phone or in writing. Self-reports made by a facility are also considered by CMS to be "complaints."

59. Complaints and complaint surveys involving hospitals, especially psychiatric hospitals, are common.

60. In a report issued in August 2025 by CMS, CMS noted that there had been a 79% increase in complaints directed against hospitals over the past five years, with over 14,500 complaints in FY 2024.

61. In federal fiscal year 2025, CMS data shows that the state of Texas performed a total of 846 complaint surveys at 60% of Texas hospitals (292 out of 492 hospitals). Of the 846 complaint surveys, 418 deficiencies were cited against 124 hospitals. A disproportionate share of those complaint surveys involved psychiatric hospitals. Although only about 10% of the hospitals in Texas are standalone psychiatric hospitals, 30% of the complaint surveys were performed at these standalone psychiatric hospitals.

**Immediate Jeopardy**

62. The statutory and regulatory scheme distinguishes between deficiencies that "immediately jeopardize the health and safety of its patients," versus those that do not. *See, generally,* 42 U.S.C. § 1395cc.

63. Under 42 C.F.R. § 489.3, immediate jeopardy is defined as "a situation in which the provider's or supplier's non-compliance with one or more requirements, conditions of

participation, conditions for coverage, or conditions for certification has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident or patient."

64.   Appendix Q in the SOM sets forth CMS's "Core Guidelines for Determining Immediate Jeopardy."

65.   There is no definition of "serious injury, harm, impairment, or death" in the regulation. Appendix Q defines serious injury, serious harm, serious impairment, or death as: death; or a significant decline in physical, mental, or psychosocial functioning (that is not solely due to the normal progression of a disease or aging process); or loss of limb, or disfigurement; or avoidable pain that is excruciating, and more than transient; or other serious harm that creates life-threatening complications/conditions.

66.   Under Appendix Q, there are three elements to citing an immediate jeopardy deficiency: non-compliance with one or more COPs; serious adverse outcome or likely serious adverse outcome as a *result* of the identified non-compliance; and need for immediate action to prevent serious injury, serious harm, serious impairment, or death.

67.   Appendix Q defines "likelihood" as a situation in which the provider's non-compliance with a requirement creates a situation where a serious adverse outcome is "reasonably expected" if immediate action is not taken.

### The Enforcement and Administrative Appeal Process

68.   If the facility fails to maintain "substantial compliance" with the prescribed COPs, resulting in a survey deficiency, the Secretary may terminate the provider agreement. 42 U.S.C. § 1395cc(b)(2) and 42 C.F.R. § 489.53(a).

69.   Where a hospital's participation in Medicare will be terminated, federal law entitles the hospital to an appeal process that includes the following: (a) a hearing before an administrative

law judge ("ALJ"); (b) review of the ALJ decision by the HHS Departmental Appeals Board ("DAB"); and (c) judicial review of the DAB's decision. 42 U.S.C. § 1395cc(h)(1)(A); 42 C.F.R. § 488.24(c); 42 C.F.R. § 498.5(b), (c); 42 C.F.R. § 498.80.

70.     The initiation of this administrative appeal process does **not** stay the termination of the provider, and there is **no process** for review of survey findings before a termination goes into effect.

71.     A review of ALJ decisions issued from 2025 reveals that it takes, on average, 3.3 years between the date the survey ended until an ALJ decision is issued. In one case, the ALJ decision came 5.5 years after the close of the survey.

72.     Further, a review of the ALJ and DAB decisions reveals that they are overwhelmingly in favor of CMS. In 2025, of 34 decisions involving a challenge to survey deficiencies, 30 were ruled in CMS's favor, one denied CMS's findings, and, in three, the ALJ upheld some findings and overturned others.  In 2024, of 28 decisions involving a challenge to survey deficiencies, 26 were ruled in CMS's favor, with one finding the underlying survey unlawful, and one dismissing the appeal because CMS had rescinded all remedies imposed.

73.     Because an appeal does not stay the enforcement action while the matter is under review, all Medicare patients would be forced to relocate until the appeal concluded, the community would be without a significant mental health care provider, and the provider would be effectively closed, for many years.

74.     In other words, a provider could suffer a termination of its Medicare participation, leading to significant negative impact to the provider (including closure), its patients, its employees, and the community at large, **based on factual errors in the survey findings or misapplication of legal standards by the surveyors** because there is zero opportunity for review

15

of these potential errors prior to termination. Such errors are rarely, if ever, reviewed since a terminated provider must withstand an administrative appeal process spanning upward of 5.5 years that results in little (if any) success, forcing the provider to then proceed to federal court, and providers are unable to obtain a monetary judgment for the significant losses incurred.

75.     The administrative appeal process afforded to providers to contest survey findings is also overly deferential to the agency and systematically favors the surveyor's initial determinations. Before the ALJ, CMS must make only a *prima facie* showing of non-compliance, which ALJ's have determined to be satisfied simply by CMS entering the Statement of Deficiencies into the record.  The burden then shifts to the provider to prove by a preponderance of the evidence that it was in substantial compliance with the regulations. Then, if an appeal of the ALJ's decision is filed with the DAB, the DAB applies the highly deferential "substantial evidence" standard.

76.     Because of the byzantine administrative appeal process, surveyors are almost never subject to cross-examination nor do they face any consequences for misconduct during a survey, citation of unsupported deficiencies, or misapplication of the law.

### Laurel Ridge's Surveys and Notice of Termination

77.     From 2010 to 2024, Laurel Ridge had never been cited for any deficiencies at the immediate jeopardy level and had only had two prior surveys involving higher level deficiencies that were promptly remediated, with the last one almost eight years ago.

78.     During the 2025 calendar year, Laurel Ridge underwent numerous surveys. As a result of those surveys, over $10 million was invested in the facility and numerous improvements were implemented. A full survey was conducted by CMS in October 2025, and while deficiencies were cited as a result of that survey, a revisit performed from January 5-7, 2026 found that the Facility was in substantial compliance with the Medicare COPs.

16

79.     Less than a month later, from February 4, 2026, to February 23, 2026, HHSC performed a survey related to several complaints (the "February 23 Survey").

80.     During the course of this survey, the surveyors alleged multiple deficiencies were causing "immediate jeopardy" (despite the Facility just having cleared a full survey only weeks before). The facility submitted written immediate jeopardy abatement plans, all of which were accepted as written, but the surveyors indicated that they could not confirm that the plans were fully implemented and that the immediate jeopardy had been removed, without any further explanation.

81.     Laurel Ridge disputes the accuracy of the factual findings by the surveyors.

82.     The surveyors also applied the incorrect legal standards.

83.     One of the surveyors bragged about causing the Medicare termination, and subsequent closure, of another psychiatric hospital in Texas, as if it were a feather in her cap. Another surveyor was a former employee of a sister facility of Laurel Ridge.

84.     By letter dated March 11, 2026 (the "March 11 Letter"), CMS formally notified the Facility of the survey findings from the February 23 Survey. The March 11 Letter stated that the Facility's Medicare agreement would be terminated on April 3, 2026 unless the immediate jeopardy was removed. Specifically, it indicated that termination could only be avoided through submission of acceptable plans of correction and subsequent verification of compliance by HHSC.

85.     The March 11 Letter stated that a plan of correction must be submitted by March 16, 2026, and the corrections had to be completed by March 26, 2026, to ensure a timely revisit survey. A true and accurate copy of the March 11 Letter is attached hereto as **Exhibit 1** and incorporated herein.

17

86.     On March 16, 2026, the Facility submitted its plan of correction to HHSC in response to the statement of deficiencies, as required, indicating that the deficiencies cited during the February 23 Survey would be corrected by March 26, 2026.

87.     On March 18, 2026 HHSC sent the Facility an email rejecting the Facility's plan of correction. HHSC required the Facility to submit a revised or addended plan of correction by March 19, 2026.

88.     HHSC applied incorrect legal standards in its review and rejection of Laurel Ridge's plan of correction.

89.     On March 19, 2026, the Facility submitted an addendum to its plan of correction to HHSC.

90.     The Facility's plan of correction, including the addendum, contained 19 different action items the Facility was taking to address the alleged deficiencies:

- Education by the Facility's medical director on Emergency Behavioral Intervention ("EBI") orders and packets;
- Revision of the Weekday Safety Huddle process;
- Comprehensive training of all staff by the Chief Nursing Officer ("CNO") on Facility policies concerning EBIs and documentation;
- Additional training for nurses on restrictive intervention documentation and escalation protocols;
- Additional training for nurses on restraint and seclusion use and documentation requirements, along with competency assessments by return demonstration;
- Revision of the Facility's camera review process by the CEO, Chief Nursing Officer, and Risk Management/Performance Improvement Director, to increase executive oversight;
- Updates by the leadership team to the Senior Leadership Rounding process to ensure daily rounding by leadership;
- Update to the Special Communication Needs policy with respect to interpreter services;
- Development of a Spanish version of the admissions consent packet, along with monitoring until 100% compliance was sustained;
- Creation of laminated visual tip sheets outlining the process for accessing the AMN Healthcare Video Remote Interpreting Device, along with daily monitoring of availability of the device and staff awareness;

- Training of admission staff, social services, therapists, and direct care staff on interpreter services, along with written competency assessment post-training;
- Creation of a new policy (Residential Services: Transition of Care) outlining the process for transitioning patients from residential treatment to acute care;
- Creation of a checklist to use for informed consent when transitioning patients from residential treatment to acute care, along with implementation of a monitoring process to verify documentation;
- Training of all clinical and nursing leadership and therapists on informed consent for level-of-care transitions and discharge planning;
- Revision to the Facility's policy on Reporting Abuse, Neglect, and Exploitation to include additional leadership oversight requirements and state requirements for 8 hours of training annually;
- Creation of a decision-tree to assist staff in recognizing and escalating possible abuse, neglect, and exploitation, with competency assessment;
- Creation of an 8-hour in-person training curriculum on abuse, neglect, and exploitation, with 100% of employees trained and competency assessed via written test;
- Revision to the new hire orientation and annual training to include the 8-hour abuse, neglect, and exploitation training;
- Termination of a staff member for use of inappropriate and excessive force.

91.    On March 23, 2026, HHSC sent the Facility an email formally rejecting the Facility's addended plan of correction on the grounds that the POC did not include sufficient detail about the actions the facility was taking and requesting it verify whether it was prepared for a revisit survey.

92.    HHSC applied the incorrect legal standards in its review and rejection of the addended plan of correction.

93.    From March 31, 2026 to April 2, 2026 HHSC performed a revisit survey (the "April 2 Survey"). The survey team conducting the revisit included a surveyor who was not a part of the original survey team.

94.    At the exit conference for the April 2 Survey, HHSC notified the Facility that the immediate jeopardy had not been abated and that it was recommending that the termination proceed.

19

95.     HHSC, the surveyors, and CMS made incorrect factual findings and applied the incorrect legal standards with respect to the April 2 Survey.

96.     On April 2, 2026, CMS sent the Facility a letter stating that the date of projected termination was extended to April 17, 2026 to grant CMS sufficient time to review the revisit survey report. A true and accurate copy of the April 2 Letter is attached hereto as **Exhibit 2** and incorporated herein.

97.     On April 3, 2026, counsel for the Facility contacted CMS requesting the opportunity to discuss the survey issues with CMS before any statement of deficiency was finalized or final decisions made.

98.     On April 9, 2026, counsel for the Facility contacted CMS, again requesting the opportunity to discuss the survey issues with CMS.

99.     On April 13, 2026, counsel for the Facility contacted CMS again, updating CMS on the ongoing improvements at the Facility and requesting clarification on the timeline and possible extension of the termination date.

100.     On April 15, 2026, counsel for the Facility shared with CMS information concerning the capital improvements and other changes and investments made to improve the Facility and address the concerns raised in the two most recent surveys.

101.     An hour later, CMS emailed a letter dated April 15, 2026 ("April 15 Letter"), formally notifying the Facility of HHSC's deficiency findings from the April 2 Survey. The April 15 Letter informed the Facility that its Medicare provider agreement would now be terminated on April 30, 2026. A true and accurate copy of the April 15 Letter is attached hereto as **Exhibit 3** and incorporated herein.

102.     CMS posted a public notice on its web page on April 15, 2026, indicating the Facility was being terminated on April 30, 2026.

103.     Since then, the Facility has had a precipitous drop in patients, from approximately 175 on April 15 to only 96 as of today (expecting to decrease to 85 by end of day).

104.     The Facility has spent millions of dollars making improvements over the past 12 months, and it has implemented measures to address and remove any and all alleged immediate jeopardy to the health and safety of its patients. In addition, the Facility has set forth its plan to ensure that it is in compliance with all federal regulations and to correct the alleged deficiencies cited in the February 23 Survey and April 2 Survey.

105.     On April 21, 2026, individuals from the CMS Center for Clinical Standards and Quality met with counsel and leaders from the Facility. Despite the significant investments made to the Facility in the past 12 months and other improvements, CMS indicated that the decision to terminate was final, and CMS would not entertain any alternative solution. At the April 21 meeting, the individuals from CMS did not appear to understand the significant collateral consequences associated with termination of an institutional provider's Medicare participation agreement.

106.     On April 23, 2026, the Facility timely filed an Appeal and Request for Hearing before an administrative law judge of the U.S. Department of Health and Human Services, Departmental Appeals Board.

**Improvements Made at Laurel Ridge**

107. Beginning in 2025, the Facility initiated comprehensive capital improvements to sustain and exceed compliance with applicable regulatory standards, strengthen the environment of care, and enhance patient safety across the campus. Specifically, the Facility made the following staffing improvements, capital improvements, and environmental modifications:

21

- Added a total of 29 full-time equivalent ("FTE") positions in 2025 and 25 FTEs in 2026. These staffing enhancements included additional patient care staff and training and education resources to optimize patient safety and regulatory compliance.
- Removed unit walls separating day rooms to improve visibility and patient monitoring, with corresponding flooring replacement and electrical and telecommunications reconfiguration.
- Replaced seclusion room doors, interior doors, door hinges, and windows as an upgrade to current safety standards.
- Made modifications to nursing stations to enhance line-of-sight supervision and staff accessibility.
- Upgraded existing ligature-resistant fixtures throughout patient care areas, including door hardware and stoppers, toilet paper holders, faucets and plumbing fixtures, ceiling tiles, and water dispensers.
- Replaced patient furniture and installed secure storage, in the form of safes, for patient belongings.
- Removed and replaced landscaping materials to improve patient safety.
- Reconstructed patient unit patios to improve safe patient access.
- Replaced multiple concrete slabs across the campus.
- Installed and replaced perimeter fencing to enhance security.
- Replaced exhaust ventilation systems.
- Upgraded camera surveillance systems to support patient monitoring and incident prevention.
- Installed protective materials, including Lexan, in designated areas to improve safety.
- Replaced patient lobby light fixtures to eliminate identified risks and improve the therapeutic environment.

108.    As of April 2, 2026, the Facility initiated significant additional staffing and structural improvements. Specifically, it has:

- Added weekend unit coordinator coverage to ensure consistent operational oversight and support seven days a week.
- Increased Milieu leadership by adding a third Milieu Manager to each unit.
- Reconfigured Milieu Manager schedules to include rotating weekend coverage, ensuring leadership presence seven days per week.
- Appointed an Associate Chief Nursing Officer ("ACNO") to strengthen nursing clinical leadership, supervision, and accountability.
- Transitioned Admissions Assessors from therapist roles to registered nurses ("RNs") to enhance clinical assessment accuracy, timeliness, and patient safety.
- Commissioned a Safety Committee and implemented a new Risk Initiative, (RSQ — Risk, Safety, and Culture).
- Implemented evening senior leadership rounds to increase executive visibility, reinforce accountability, and proactively address safety concerns in real time.

- Increased staffing to ensure that dedicated staff are always available for one-to-one supervision when clinically indicated.
- Increased reviews of camera footage to 100% of Emergency Behavioral Interventions ("EBIs"), with random reviews of all footage occurring across all shifts.
- Ordered Relay Pro communication devices, equipping staff with real-time communication capabilities, integrated panic button functionality to immediately summon assistance during emergencies, and enhanced coordination across units to support rapid response and de-escalation.

109.    The Facility is currently undertaking the following improvement projects to further enhance the safety and quality of care provided to its patients. Specifically, implementation is scheduled to begin imminently for the following initiatives:

- Increasing the height of standard nursing stations to further enhance patient observation and staff safety.
-  Reconfiguring door access points to ensure controlled entry and exit.
- Installing additional door hinges in the admissions area to meet safety specifications.
- Replacing and modifying windows across all patient care units.

### Harm to Laurel Ridge and Others by Termination

110.    The Defendants' proposed termination of Laurel Ridge's participation in Medicare, effective as of April 30, 2026, unless enjoined by this Court, will cause irreparable injury for which Plaintiff has no adequate remedy at law.

111.    Upon termination, the Facility will no longer be able to accept any patients covered by Medicare or Medicare Advantage for inpatient treatment.

112.    As noted above, because Laurel Ridge's contract to provide treatment to individuals covered by Tricare requires that providers participate in Medicare, the agreement covering one-third of the Facility's patients will be terminated and all active duty military and veterans will no longer be able to receive inpatient or outpatient treatment through Laurel Ridge's dedicated 80-bed military unit at a time when the United States has an active military engagement in Iran.

113.     Federal regulations require that, if CMS terminates a hospital's Medicare agreement, the state Medicaid program must terminate the hospital's Medicaid agreement. 42 C.F.R. § 455.416. Therefore, Laurel Ridge will no longer be able to accept or treat Medicaid patients.

114.     Because substantially all private payer contracts held by Laurel Ridge require Medicare participation or provide that involuntary termination from Medicare is grounds for termination, and because the remaining contracts contain provisions that effectively condition continued participation on Medicare certification, every contract held by Laurel Ridge will inevitably be terminated. Laurel Ridge has already received letters of termination from private insurers following CMS's public notification on April 15 of Laurel Ridge's Medicare termination.

115.     Because **all** of its payer sources for inpatient services will be eliminated, except private pay (which makes up only 1%), Laurel Ridge will be forced to close the entirety of its inpatient services that has been open and available to the San Antonio community for nearly 40 years.

116.     The closure of Laurel Ridge's inpatient psychiatric hospital will result in the layoff of nearly all of the Facility's 659 employees and 22 psychiatrists. These employees and psychiatrists will seek employment elsewhere and many will no longer be available for re-hire in the event Laurel Ridge were to later be re-opened.

117.     Without the corresponding inpatient services, outpatient services will be drastically reduced, if not fully eliminated.

118.     The 42-bed residential treatment center for children will likely be shuttered as well since those services are part of the contracts that the Facility has with its private payers, which are

subject to termination as a result of the inpatient unit's Medicare termination, and loss of staff due to the closure of the inpatient psychiatric hospital.

119. The state of Texas will lose its largest inpatient psychiatric provider that has been an integral part of the mental health service delivery system for 40 years.

120. The closure of Laurel Ridge's inpatient psychiatric hospital will interrupt the care and treatment of hundreds of individuals in the San Antonio community and surrounding areas, who have a higher prevalence of depressive disorder in comparison to state and national averages.

121. The closure of Laurel Ridge significantly jeopardizes patient access to inpatient psychiatric services because the number of beds in the San Antonio area without Laurel Ridge will be insufficient to meet the community's needs.

122. The San Antonio community will be without the millions of dollars in charity care provided by Laurel Ridge.

123. The employees of Laurel Ridge and the San Antonio community will lose approximately $48.5 million in payroll as a result of CMS's action, and, with it, health care coverage through the Facility's employer-sponsored health insurance plan.

124. Eight different universities with medical, nursing, and therapy programs will lose a significant training site, exacerbating the national healthcare workforce shortage.

125. Laurel Ridge will have lost the benefit of over $10 million in capital improvements it has made at Laurel Ridge since 2025.

126. There is no adequate remedy at law because Laurel Ridge would be unable to recover millions of dollars in lost revenue if CMS's termination is overturned during the administrative appeal process, as CMS and HHSC are shielded by sovereign immunity.

25

## V. CAUSES OF ACTION

### COUNT I – VIOLATION OF PROCEDURAL DUE PROCESS

127.    Plaintiff realleges paragraphs 1 through 126 as if set forth in full.

128.    The termination of the Facility's Medicare and Medicaid program participation, which results in the termination of the Facility's Medicare Advantage provider agreements, Tricare agreement, and private payer agreements, forcing the Facility's closure, without sufficient notice and an opportunity to be heard, constitutes a violation of the Facility's right to procedural due process under the Fifth Amendment to the United States Constitution.

### COUNT II – VIOLATION OF THE MEDICARE ACT

129.    Plaintiff realleges paragraphs 1 through 128 as if set forth in full.

130.    The termination of the Facility's Medicare and Medicaid program participation, which results in the termination of the Facility's Medicare Advantage provider agreements, Tricare agreement, and private payer agreements, forcing the Facility's closure, without sufficient notice and an opportunity to be heard, constitutes a violation of the Facility's right to a hearing as set forth in  42 U.S.C. § 1395cc(b)(2) and (h)(1).

### COUNT III – THE TERMINATION AND ADMINISTRATIVE APPEAL PROCESS UNDER THE MEDICARE ACT IS UNCONSTITUTIONAL

131.    Plaintiff realleges paragraphs 1 through 130 as if set forth in full.

132.    The Medicare Program is the single largest health insurance plan in the United States, and a termination of its Medicare participation agreement is a death knell for Plaintiff. Therefore, to the extent the Medicare Act does not afford Plaintiff any opportunity to be heard *prior to* a termination of its Medicare participation, the most severe sanction that may be imposed by CMS, then the Medicare Act is in violation of the Fifth Amendment to the United States Constitution.

133.    Further, the administrative appeal scheme set forth in the Medicare Act and associated regulations does not stay the termination while the administrative appeal, which takes years to complete, is pending, thereby violating the Fifth Amendment to the United States Constitution.

134.    Because the administrative appeal process has been carried out in such a way as to shift the burden from CMS to the provider, and provides inordinate deference to CMS, it is in violation of the Fifth Amendment to the United States Constitution.

## COUNT IV – VIOLATIONS OF THE MEDICARE ACT AND ADMINISTRATIVE PROCEDURE ACT

135.    Plaintiff realleges paragraphs 1 through 134 as if set forth in full.

136.    The termination of the Facility's Medicare and Medicaid participation agreements, forcing its closure, is based upon survey methods, procedures, and forms set forth in sub-regulatory guidance. Because the guidance documents governing surveys set forth substantive rules that have not been published as regulations in accordance with the notice-and-comment rulemaking requirements of the Medicare Act or Administrative Procedure Act, Defendants' actions are in violation of the Medicare Act, 42 U.S.C. § 1395hh(a)(2), and the APA, 5 U.S.C. §§ 553 *et seq*. and 706. Consequently, Defendants' actions taken pursuant to those rules are illegal, void, and of no effect.

137.    The interpretive guidelines used by surveyors in Appendix A of the State Operations Manual in enforcing the COPs set forth in 42 C.F.R. Part 482 also constitute substantive rules that have not been published as regulations in accordance with the notice-and-comment rulemaking requirements of the Medicare Act or APA. Defendants' actions thus violate the Medicare Act, 42 U.S.C. § 1395hh(a)(2), and the APA, 5 U.S.C. §§ 553 *et seq*. and 706. Consequently, Defendants' actions taken pursuant to those rules are illegal, void, and of no effect.

27

## COUNT V – VIOLATION OF THE PLAINTIFF'S RIGHT TO EQUAL PROTECTION

138.   Plaintiff realleges paragraphs 1 through 137 as if set forth in full.

139.   Defendants have surveyed facilities in a manner that has been so inconsistent that their purported termination of Plaintiff denies Plaintiff its rights under the Equal Protection Clause (Amendment 14) of the United States Constitution and due process of law in violation of the Fifth Amendment of the United States Constitution.

## COUNT VI – TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

140.   Plaintiff realleges paragraphs 1 through 139 as if set forth in full.

141.   Pursuant to Rule 65 of the Federal Rules of Civil Procedure, a temporary restraining order and preliminary injunction should be issued enjoining Defendants from terminating the Facility's Medicare provider agreement until such time as Plaintiff's constitutional and statutory claims have been resolved. Plaintiff has demonstrated a likelihood of success on the merits of its claims that Defendants violated Plaintiff's procedural due process rights and the Administrative Procedure Act by failing to follow required procedures in terminating the Facility's Medicare provider agreement. Plaintiff will suffer irreparable harm absent injunctive relief, as termination will force the closure of the largest psychiatric hospital in Texas, displace hundreds of patients including children and active-duty military personnel, and eliminate over 650 jobs. Traditional legal remedies are inadequate because the harms contemplated are not readily monetizable and sovereign immunity bars recovery of lost revenues. The balance of harms favors Plaintiff, as Defendants will not be harmed in any perceptible way by maintaining the status quo, while Plaintiff, its patients, employees, and the surrounding community will suffer devastating and irreparable consequences if termination proceeds. The public interest strongly favors the issuance

28

of injunctive relief, as the unwarranted and accelerated closure of a facility providing essential psychiatric care to thousands of patients, including vulnerable children and military service members, serves no legitimate public purpose.

## VI. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays this Court for the following relief:

A.       Its order issuing a temporary restraining order pursuant to Rule 65 of the Federal Rules of Civil Procedure, prohibiting Defendants from terminating Plaintiff's Medicare provider agreement, or taking any actions on the basis thereof, including revoking billing privileges, refusing to pay for services, or publishing any notice of termination, pending a hearing on Plaintiff's request for a preliminary injunction;

B.       Its order and judgment enjoining and restraining Defendants and each of them preliminarily and permanently, from effecting or attempting to effect, any action terminating Plaintiff's Medicare participation agreement until the Plaintiff is provided due process of law and the other procedural protections to which it is entitled by law;

C.       Its order and judgment enjoining and restraining Defendants and each of them preliminarily and permanently, from publishing any notice in any medium or by any means of an action to terminate Plaintiff's Medicare participation agreement until the Plaintiff is provided due process of law and the other procedural protections to which it is entitled by law, or, to the extent Defendants have published such notice, its order and judgment requiring Defendants and each of them to retract such published notices;

D.       Its order and judgment declaring that the Medicare Act's termination and administrative appeal provisions are unconstitutional for failure to afford providers an opportunity to be heard prior to effectuation of a termination;

E.      Its order and judgment declaring that Defendants' use of the State Operations Manual and other guidance materials that have not been promulgated according to the notice-and-comment procedures of the Medicare Act and the Administrative Procedure Act in carrying out the termination of Plaintiff's Medicare participation agreement is unlawful;

F.      Its order granting such other and further relief as the Court may deem just and proper.

Respectfully submitted,

**HUSCH BLACKWELL LLP**

111 Congress Avenue, Suite 1400
Austin, Texas 78701
(512) 472-5456
(512) 479-1101 (fax)


By: */s/ Jody Rudman*
Jody Rudman
Texas Bar No. 00797356
jody.rudman@huschblackwell.com

And

EMILY M. SOLUM   MO Bar #65089 (*pro hac* pending)
630 Bolivar Street, Suite 300
Jefferson City, MO 65101
Telephone: 573-635-9118
Facsimile: 573-634-7854
Email: Emily.Solum@huschblackwell.com

And

**CHASNOFF STRIBLING**

1020 NE Loop 410, Suite 150
San Antonio, Texas 78209
Telephone: (210) 469-4155
Facsimile:  (210) 855-9898

Faith Elaine Lowry
Texas Bar No. 24099560

30

flowry@chasnoffstribling.com
Blake Stribling
Texas Bar No. 24070691
bstribling@chasnoffstribling.com

**ATTORNEYS FOR PLAINTIFF**