**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| TEXAS LAUREL RIDGE HOSPITAL, LP, | § | |
| *Plaintiff* | § | |
| | § | |
| v. | § | Case No.  SA-26-CA-02701-JKP |
| | § | |
| SECRETARY ROBERT F. KENNEDY | § | |
| JR., UNITED STATES DEPARTMENT | § | |
| OF HEALTH AND HUMAN SERVICES; | § | |
| DR. MEHMET OZ, ADMINISTRATOR | § | |
| OF THE CENTERS FOR MEDICARE | § | |
| AND MEDICAID SERVICES; AND | § | |
| TEXAS HEALTH AND HUMAN | § | |
| SERVICES COMMISSION, | § | |
| *Defendants* | § | |

**ORDER DENYING TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION**

On this date, the Court considered Plaintiff's Motion for Leave to Exceed Page Limit (ECF No. 7) and Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 7-1).  After careful consideration, the Motion for Leave to Exceed Page Limit is **GRANTED**, and the Motion for Temporary Restraining Order and Preliminary Injunction is **DENIED.**

**BACKGROUND**

Plaintiff Texas Laurel Ridge is the largest psychiatric hospital in Texas.  ECF No. 1 at 1. Defendants are the United States Secretary of the Department of Health and Human Services ("DHHS"), the Administrator of the Centers for Medicare and Medicaid Services ("CMS"), and the Texas Health and Human Services Commission ("THHSC").

Plaintiff provides numerous psychiatric services, both inpatient and outpatient.  ECF No. 1 at 6.  Among other things, it has a residential treatment center for children, ECF No. 1 at 24, and a unit dedicated to treating military personnel, ECF No. 1 at 9.

1

Hospitals that—like Plaintiff, ECF No. 1 at 6—participate in Medicare or Medicaid are subject to regular "surveys" to ensure compliance with the "Conditions for Participation" in Medicare and Medicaid. ECF No. 1 at 11. Some surveys are routine, while others are in response to complaints. ECF No. 1 at 13. Complaints are common for providers, especially psychiatric providers. *Id.* In Texas, THHSC conducts these surveys. ECF No. 1 at 5.

In October 2025, Plaintiff was subject to a full survey, which found some deficiencies. ECF No. 1 at 16. But a revisit survey performed in January 2026 found Plaintiff was in substantial compliance with the Conditions for Participation. *Id.*

In February 2026 Plaintiff was subject to another survey, in response to several complaints. ECF No. 1 at 17. The February survey found "deficiencies that represent **immediate jeopardy** to patients." ECF No. 1-4 at 2 (emphasis in original); ECF No. 1 at 17. As a result, Defendants determined that Plaintiff no longer met the requirements to participate in the Medicare program. ECF No. 1-4 at 2. Defendants notified Plaintiff that, unless it fixed the identified problems, its ability to participate in the Medicare program would be terminated. *Id.* Plaintiff submitted multiple plans to address the alleged deficiencies. *E.g.*, ECF No. 1 at 17. Some of those plans were accepted on paper, but surveyors said they could not confirm the plans were fully implemented. *Id.*

Defendants performed a "revisit survey" from March 31 to April 2, which included an "exit conference." ECF No. 1 at 19. At the exit conference, the surveyors informed Plaintiff that the previously identified problems had not been fixed so the surveyors would recommend termination. ECF No. 1 at 19.

On April 2, 2026, Defendants extended the projected termination date from April 3 to April 17 to allow for time to review the revisit survey reports. ECF No. 1 at 17, 20. Plaintiff's

counsel contacted Defendants multiple times between April 3 and April 15, "requesting the opportunity to discuss the survey issues and providing updates on ongoing improvements."  ECF No. 7-1 at 10.   On April 15, Defendants notified Plaintiff that its Medicare agreement would be terminated on April 30.  ECF No. 1 at 20; ECF No. 1-6.  On April 21, Defendants confirmed that the decision was final.  ECF No. 1 at 21.

Defendants provide a process for administrative review, but Plaintiff alleges that process takes years and generally results in determinations in Defendants' favor.  ECF No. 1 at 4, 15.

On April 23, 2026, Plaintiff initiated Defendants' administrative review process and filed this suit.

Plaintiff brings claims under Procedural Due Process, the Medicare Act, Equal Protection, and the APA.  It primarily argues that it is entitled to a greater opportunity to be heard *before* the termination of its ability to participate in the Medicare program.  Plaintiff seeks a temporary restraining order and preliminary injunction enjoining Defendants from terminating Plaintiff's Medicare provider agreement "until such time as Plaintiff's constitutional and statutory claims have been resolved."

Plaintiff moved for leave for its Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction to exceed the page limit.  ECF No. 7.  It attached the Motion for a Temporary Restraining Order and Preliminary Injunction to the Motion for Leave.  ECF No. 7-1.

### MOTION FOR LEAVE TO EXCEED PAGE LIMIT

As an initial matter, the Motion to Exceed Page Limit (ECF No. 7) is **GRANTED.**  The Court will consider the Motion for a TRO and Preliminary Injunction that is attached to the Motion for Leave (ECF No. 7-1).

**SUBJECT MATTER JURISDICTION**

Plaintiff's first roadblock is establishing subject matter jurisdiction. "Under 42 U.S.C. [Section] 405(g) and (h), federal courts are vested with jurisdiction over only a 'final decision' of HHS when dealing with claims 'arising under'" the Medicare Act. *Family Rehab., Inc. v. Azar*, 886 F.3d 496, 500 (5th Cir. 2018); *Blue Valley Hosp., Inc. v. Azar*, 322 F. Supp. 3d 1149, 1161 (D. Kan. 2018) (citing Heckler v. Ringer, 466 U.S. 602, 614–15 (1984)), *aff'd*, 919 F.3d 1278 (10th Cir. 2019). So a provider generally cannot seek judicial review of claims like the ones here unless it has "channeled" the claims through HHS's administrative review procedures. Plaintiff does not claim to have done so and does not dispute that its claims "aris[e] under" the Medicare Act.

Instead, Plaintiff argues that two exceptions to the "channeling" requirement apply. It relies primarily on the "collateral-claim" exception first articulated in *Mathews v. Eldridge*, 424 U.S. 319, 330 (1976). It also invokes an exception that applies when channeling would really "mean no review at all." ECF No. 1 ¶ 8.

I.      **Collateral-Claim Exception**

First, a federal court can hear "claims (a) that are 'entirely collateral' to a substantive agency decision and (b) for which 'full relief cannot be obtained at a postdeprivation hearing." *Family Rehab.*, 886 F.3d at 501.[1] Stated more directly, "'when a plaintiff asserts a collateral challenge that cannot be remedied after the exhaustion of administrative review,' courts shall deem exhaustion waived." *Id.* (quoting *Affiliated Prof'l Home Health Care Agency v. Shalala*, 164 F.3d 282, 285 (5th Cir. 1999)).

---

[1] "There is [another] prong of the collateral-claim exception: '[T]here must have been presentment to the Secretary.'" *Id.* at 501 n.7. Plaintiff satisfied this requirement by initiating the administrative review process.

a.   "Entirely Collateral" Requirement

Some of Plaintiff's claims are "entirely collateral," while others are not.

> For a claim to be collateral, it must not require the court to immerse itself in the substance of the underlying Medicare claim or demand a factual determination as to the application of the Medicare Act.  Nor can the claim request relief that would be administrative, i.e., the substantive, permanent relief that the plaintiff seeks or should seek through the agency appeals process.  Instead, the claim must seek some form of relief that would be unavailable through the administrative process.

*Id.* at 501–02.  "If the court must examine the merits of the underlying dispute, delve into the statute and regulations, or make independent judgments as to plaintiffs' eligibility under a statute, the claim is not collateral."  *Id.* at 503.  "And if plaintiffs request relief that is proper under the organic statute—by requesting that benefits or a provider status be *permanently* reinstated—the claim is not collateral."  *Id.* (emphasis in original).

### 1.  Procedural Due Process Claims

Plaintiff's procedural due process claims are collateral insofar as they seek a pre-termination hearing.  Under these claims, Plaintiff primarily argues that it did not and will not receive sufficient notice and opportunity to be heard before the termination of its Medicare approval.  Plaintiff also alludes to purported unfairness in HHS administrative proceedings, including that the government almost always wins and that the burden is generally shifted to the provider after the government files a "Statement of Deficiencies."  ECF No. 1 at 16.

### A.  Claim for Further Pretermination Process

Insofar as Plaintiff argues it is entitled to more pre-termination process, this claim is entirely collateral.  "[P]laintiffs may bring claims that sound only in constitutional or procedural

law . . . and request that benefits be maintained temporarily until the agency follows the statutorily or constitutionally required procedures." *Family Rehab.*, 886 F.3d at 503.

In *Family Rehabilitation v. Azar*, the plaintiff "ask[ed] only that recoupment [of certain Medicare revenues] be suspended until a hearing, and . . . raise[d] claims unrelated to the merits of the recoupment." *Id.* Those claims were thus collateral. *Id.* Similarly, Plaintiff's primary procedural due process claim requests only that termination be suspended until a hearing, and it is separate from the merits of the termination claim. So that claim is also collateral. *See also Marion Nursing Ctr., Inc. v. Sebelius*, No. 4:13-CV-2953-MGL, 2013 WL 6019322, at *3 (D.S.C. Nov. 13, 2013) ("[T]he procedural due process claim to a pre-termination hearing . . . appears wholly collateral to [the] substantive claim of erroneous termination of [the plaintiff's] Medicare/Medicaid provider status, which is still properly the subject of the administrative review process."); *GOS Operator, LLC v. Sebelius*, 843 F. Supp. 2d 1218, 1229 (S.D. Ala. 2012) (finding that circumstances similar to Plaintiff's "appear ideally suited for application of the 'entirely collateral' exception"); *THI of Kan. at Highland Park, LLC v. Sebelius*, No. 13-2360-JAR-JPO, 2013 WL 4047570, at *8 (D. Kan. Aug. 9, 2013) ("Assuming Plaintiff's claim in this case is confined to a due process challenge, seeking injunctive relief on the grounds that it is entitled to a pre-termination hearing, it is 'entirely collateral' from its substantive challenge to the Secretary's termination decision.").

### B. Bias and Burden-Shifting Claim

Plaintiff's procedural due process claims based on bias and Defendants' burden shifting framework, however, are not collateral. These claims essentially ask the Court to determine the substantive standards applicable to Plaintiff's underlying claims, consider whether those standards are constitutional, and analyze whether Defendants applied the standards faithfully. That is, at the

very least, "delv[ing] into the statute and regulations." *Family Rehab.*, 886 F.3d at 501. It would also require factual determinations regarding the application of the Medicare Act to this and other cases. *Cf. id.* at 502 (noting that in *Affiliated Professional*, 164 F.3d at 285–86, the Fifth Circuit found a claim not collateral where a plaintiff challenged alleged "improper and arbitrary enforcement of 'various Medicare rules and regulations'").

In *Bowen v. City of New York*, the Supreme Court found a claim collateral where a class of plaintiffs alleged "an unlawful, unpublished policy under which countless deserving claimants were denied benefits." 476 U.S. 467, 473 (1986). *Bowen* was a class action and emphasized that the facts there were "materially distinguishable from [a case] in which a claimant . . . alleg[es] mere deviation from the applicable regulations in his particular administrative proceeding." *Id.* It involved a "systemwide, unrevealed policy that was inconsistent in critically important ways with established regulations." *Id.* at 485. "Under th[o]se unique circumstances, there was nothing to be gained from permitting the compilation of a detailed factual record, or from agency expertise." *Id.*

Plaintiff at least arguably alleges "systemwide" problems, particularly that the process is biased and that Defendants need only make a "prima facie showing" to shift the evidentiary burden to the provider.

But alleging a systemwide problem is not decisive. In *Heckler v. Ringer*, 466 U.S. 602, 610 (1984), the Supreme Court found a claim was not collateral where the plaintiffs challenged an HHS "rule that [purportedly] violated both 'constitutional due process and numerous statutory provisions.'" *Family Rehab.*, 886 F.3d at 502. Even though the rule was systemwide, the Court determined that the plaintiffs' claims were not collateral because they were essentially that the plaintiffs should be paid for certain procedures. *Id.*; *Heckler*, 466 U.S. at 614 ("The relief

respondents request is that the Secretary change her policy so as to allow payment for [the relevant kind of] surgery so that respondents simply will not have to resort to the administrative process.").

Plaintiff's bias and burden-shifting claims are somewhere between *Bowen* and *Ringer*. Unlike the plaintiffs in *Ringer*, Plaintiff here does not essentially ask for the substantive relief requested in the administrative proceedings. Instead, it seemingly asks for less bias and a different allocation of burdens.

But the claims are less "collateral" than those in *Bowen*. For one thing, unlike in *Bowen*, Plaintiff does not challenge a non-public policy. Further, this case is not a class action, so the question will be primarily about whether *Plaintiff* faces bias and how the burden shifting framework applies to *this* case. Deciding these issues will likely require substantive and factual determinations under the applicable regulations. Plaintiff's reliance on the purported bias of two of the surveyors who conducted the February survey provides further support that these claims are at least partially fact-specific. ECF No. 1 at 17.

Further, the burden-shifting framework Plaintiff challenges is seemingly an actual, explicit legal standard used to make substantive decisions in administrative proceedings. That likely differentiates this case from *Bowen*, because that is a topic on which there is certainly something "to be gained from permitting the compilation of a detailed factual record, [and/]or from agency expertise." 476 U.S. at 485.

For those reasons, Plaintiff's claims of bias and that HHS's burden shifting framework violates procedural due process are not collateral.

### 2. *Medicare Act Claim*

Plaintiff's Medicare Act claim asserts that it did not receive procedures required by 42 U.S.C. Section 1395cc(b)(2) and (h)(1). Section 1395cc(b)(2) allows HHS to terminate a

provider's Medicare agreement "upon such reasonable notice to the provider and the public as may be specified in regulations," after HHS has made certain determinations. One such determination is that a "provider fails to comply substantially with the provisions of the agreement, with the provisions of this subchapter and regulations thereunder, or with a corrective action required under section 1395ww(f)(2)(B) of this title." 42 U.S.C. § 1395cc(b)(2)(A).

Section 1395cc(h)(1)(A) provides that an institution "dissatisfied" with HHS's termination decision "shall be entitled to a hearing" "to the same extent as is provided in" 42 U.S.C. Section 405(b), and to judicial review under 42 U.S.C. Section 405(g) and (h).

Section 1395cc(h)(1)(B) provides institutions "expedited access to judicial review" "under the process established under [42 U.S.C.] [S]ection 1395ff(b)(2)." Section 1395ff(b)(2) provides for expedited judicial review when HHS's "Departmental Appeals Board does not have the authority to decide the question of law or regulation relevant to the matters in controversy and . . . there is no material issue of fact in dispute."

Section 1395cc(h)(1)(C) requires HHS to "develop and implement a process to expedite proceedings . . . in which . . . the remedy of termination of participation has been imposed."

Plaintiff does not explain how Defendants are purportedly violating these provisions. Still, Plaintiff's claims that Defendants failed to follow them are collateral. Like the Procedural Due Process claims, these claims seemingly concern only whether Plaintiff has received adequate processes before termination. And the fact that the claims are based on the Medicare Act is not decisive. *See Bowen*, 476 U.S. at 483 (finding claim collateral where plaintiffs "challenged the Secretary's failure to follow the applicable regulations").

### 3. Administrative Procedure Act Claims

Plaintiff's next set of claims is under the APA and Medicare Act, but to differentiate from the claims discussed above, the Court labels them the "APA Claims." Under these claims, Plaintiff argues that Defendants used "survey methods, procedures," forms, and standards "set forth in sub-regulatory guidance" that never went through notice-and-comment rulemaking. As such, Plaintiff says, "Defendants' actions taken pursuant to those rules are illegal, void, and of no effect."

These claims are not collateral. Plaintiff argues that, because the relevant documents did not undergo notice-and-comment rulemaking, "Defendants' actions taken pursuant to th[e]se rules are illegal, void, and of no effect." ECF No. 1 at 27. And Plaintiff asks for a declaration that use of these documents "in carrying out the termination of Plaintiff's Medicare participation agreement is unlawful."

The claim that Defendants' actions were "illegal, void, and of no effect" seems to ask for substantive relief—a declaration that the termination of Plaintiff's Medicare status was invalid. And a declaration that the documents' use in *this case* is unlawful would likely require the Court to "examine the merits of the underlying dispute." *Family Rehab.*, 886 F.3d at 503; *see also Blue Valley Hosp.*, 322 F. Supp. 3d at 1164 ("By challenging the agency's rule-making process and the application of those rules . . . in the termination decision, [the plaintiff's] due process claim is the vehicle by which it seeks to reverse the agency, and cannot be entirely collateral.").

Plaintiff also briefly argues that Defendants did not provide reasonable opportunity for Plaintiff to correct deficiencies found during the surveys. ECF No. 7-1 at 24 n.6. The argument here is that in *this case* Defendants failed to follow their regulations, making their decision ineffective. *Id.* That is not collateral; in fact, it is presumably the same argument Plaintiff will make to the agency.

### 4. Equal Protection Claim

Finally, Plaintiff raises an equal protection claim, arguing that Defendants survey facilities "in a manner that has been so inconsistent that their purported termination of Plaintiff denies Plaintiff its" equal-protection rights. ECF No. 1 at 28.

This equal protection claim would seemingly require examining whether Defendants' treatment of Plaintiff was arbitrary. *See* ECF No. 1 at 28 ("Defendants have surveyed facilities in a manner that has been so inconsistent that their purported termination of Plaintiff denies Plaintiff its rights under the Equal Protection Clause."). In *Affiliated Professional Home Health Care Agency v. Shalala*, the Fifth Circuit found a similar claim not collateral. 164 F.3d at 285–86 ("[T]o fully address [the plaintiff's] claim that their due process and equal protection rights were violated through the improper enforcement of Medicare regulations, a court would necessarily have to immerse itself in those regulations and make a factual determination as to whether [the plaintiff] was actually in compliance.").

### 5. Summation

In sum, (1) Plaintiff's due process claim that it is entitled to further notice and opportunity to be heard before its termination and (2) its Medicare Act claims that Defendants did not follow statutorily required procedures prior to termination are "entirely collateral." Plaintiffs' other claims are not.

### b. Colorable Claim of Irreparable Harm

To satisfy the second step of the "collateral-claim" exception, Plaintiff must have "'raised at least a colorable claim' that erroneous recoupment will 'damage [it] in a way not recompensable through retroactive payments.'" *Family Rehab.*, 886 F.3d at 504. Plaintiff has cleared that bar. It convincingly argues that, because a large portion of its contracts require Medicare participation, termination would likely drive Plaintiff out of business. ECF No. 1 at 6; ECF No. 7-1 at 34–35.

11

That would hurt Plaintiff's employees and patients, and Plaintiff points out that sovereign immunity would bar any monetary recovery. "The combined threats of going out of business and disruption to Medicare patients are sufficient for irreparable injury." *Id.* So, to the extent Plaintiff's claims are collateral, this Court has jurisdiction.

## II.    "No Review at All" Exception

Plaintiff also raises a second exception to the channeling requirement that applies when Section 405 "would not simply channel review through the agency, but would mean no review at all." *Family Rehab.*, 886 F.3d at 504. "This exception is narrow and applies only when channeling a claim through the agency would result in the *complete* preclusion of judicial review." *Id.* at 504–05 (cleaned up). Plaintiff "must show either that bringing its claim administratively is a legal impossibility, or that it faces a serious practical roadblock to having its claims reviewed in any capacity, administratively or judicially." *Id.* at 505 (same).

The Fifth Circuit found this exception did not apply in a case where, as here, the plaintiff would likely go out of business before the administrative process could be completed. *Id.*

Further, the Fifth Circuit has "required channeling so long as 'there potentially were other parties with an interest and a right to seek administrative review.'" *Id.* "Given the thousands of ongoing Medicare appeals . . . there is no dearth of third parties with both the incentive and capacity to challenge the timeliness of ALJ hearings," Defendants' purported bias and inconsistency, or the validity of the policies used in Defendants' surveys. *See id.* This exception does not apply.

## III.    Summation

Under the "collateral-claim" exception to Section 405's channeling requirement, this Court has jurisdiction over Plaintiff's due process and Medicare Act claims to the extent those claims

argue that Plaintiff is entitled to further procedures before its termination.  The Court lacks jurisdiction over Plaintiff's other claims.

## MOTION FOR TRO AND PRELIMINARY INJUNCTION

Moving to the merits, Plaintiff is not entitled to a temporary restraining order or a preliminary injunction.

### I.    Preliminary Requirements for *Ex Parte* TRO

*Ex parte* TROs should be limited to preserving the status quo until a preliminary injunction hearing.  *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 439 (1974).  A TRO can only be granted *ex parte* if (1) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (2) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.  FED R. CIV. P. 65(b).

Plaintiff's attorney has not certified any effort to give notice and has not explained why notice should not be required.  That is an independent basis to deny the Motion for a TRO.  But given the emergency nature of this Motion, and because the Court concludes a TRO and Preliminary Injunction are improper regardless, the Court will consider the Motion's Merits.

### II.    TRO/Preliminary-Injunction Factors

To be entitled to a temporary restraining order or preliminary injunction, a movant must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that may result from the injunction to the non-movant; and (4) that the injunction will not undermine the public interest. *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997); *Hill v. Green Cnty. Sch. Dist.*, 848 F. Supp. 697, 703 (S.D. Miss. 1994) (citing *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567 (5th Cir. 1974)).

a.   Likelihood of Success on the Merits

Plaintiff has not shown a substantial likelihood of success on the merits.

1. *Medicare Act, APA, and Equal Protection Claims*

As to the Medicare Act claims, Plaintiff provides no explanation of how Defendants' pre-termination processes allegedly violate the Medicare Act.  Similarly, even if the Court had jurisdiction over the APA claims, Plaintiff has not provided any explanation of how the challenged policies apply in this case.  The equal protection claim is similarly cursory—the only elaboration on it is that Defendants have a lot of policy guidance, some of which is outdated or contradictory.

2. *Bias and Burden-Shifting Procedural Due Process Claims*

If the Court had jurisdiction over the bias and burden-shifting due-process claims, Plaintiff still has not shown a substantial likelihood of success on them.

Plaintiff essentially says this:  First, HHS surveyors are often former clinicians, some of whom have been rejected by the hospitals they are now surveying.  ECF No. 1 at 12.  Second, providers almost always lose in HHS's administrative-review process.  In 2024 and 2025 combined, 56 out of 62 proceedings alleging survey deficiencies came out in HHS's favor.  ECF No. 1 at 15.  Third, the burden in the administrative-review process generally shifts to the provider after the government files a "Statement of Deficiencies."  ECF No. 1 at 16.  Fourth, one of the surveyors in the February survey bragged about causing the termination and closure of another psychiatric hospital. ECF No. 1 at 17.  And fifth, another of the surveyors had previously worked for a "sister facility" of Plaintiff.  *Id.*

Without more, that does not show a substantial likelihood of success.  The discrepancy in outcomes may simply be because Defendants' surveyors rarely cite problems that do not exist. HHS also seemingly gives providers an opportunity to remediate the problems and, in fact,

14

seemingly gave Plaintiff such an opportunity here.  ECF No. 1-4.  So it is entirely possible that HHS proceedings simply don't generally start unless there is an actual problem.

As to the burden-shifting argument, Plaintiff does not explain how much detail or documentary evidence a "Statement of Deficiencies" includes, or why it is purportedly insufficient to shift the evidentiary burden in the administrative-review proceedings.

As to the purported bias of specific surveyors, those are issues to be raised in administrative proceedings, since they go to the merits of Plaintiff's substantive claims before Defendants.  So, to the extent Plaintiff's claims are premised on the bias of the specific surveyors who went to Plaintiff's facilities, this Court lacks jurisdiction.

> 3.  *Procedural Due Process Argument That Plaintiff Is Entitled to Greater Pre-Termination Process*

Plaintiff's claim that the Due Process Clause entitles it to greater pre-termination procedures is also not likely to succeed on the merits.

"[T]he overwhelming majority of authorities (including all or virtually all appellate decisions) to have addressed the issue have concluded that Medicare providers enjoy no constitutional right to a pre-termination hearing."  *GOS Operator*, 843 F. Supp. 2d at 1233 (collecting cases); *see also Blue Valley Hosp.*, 322 F. Supp. 3d 1149; *Marion Nursing Ctr.*, 2013 WL 6019322, at *1; *Blue Valley Hosp., Inc. v. Azar*, 919 F.3d 1278, 1286 (10th Cir. 2019); *but see Symphony Hospice, Inc. v. Becerra*, No. ED CV 25-2498-JFW(PVCX), 2025 WL 3050054 (C.D. Cal. Oct. 3, 2025) (finding likelihood of success on the merits on a similar procedural due process claim, though noting that the government had not found "immediate jeopardy" there and that the government's interest would be more compelling if it had).  Indeed, although the Fifth Circuit seemingly has not addressed the issue, at least six circuits "have determined that Medicare

providers enjoy no constitutional right to a pre-termination hearing." *THI of Kan. at Highland Park*, 2013 WL 4047570, at *8 (collecting cases).

Supreme Court dictum also supports this outcome.

[I]n *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773 . . . (1980), the Court held that Medicaid patients were not entitled to a hearing prior to their transfer from an institution whose provider agreement had been terminated. The Court stated that, "the patients argue that they are third party beneficiaries of the provider agreement . . . and that this status somehow entitles them to more than [the provider] itself is entitled to[—]namely, a pretermination hearing."

*Northlake Cmty. Hosp. v. United States,* 654 F.2d 1234, 1242–43 (7th Cir. 1981) (citing *O'Bannon*, 447 U.S. at 785 n.17).

### A.  *Mathews* Balancing

Further, the cases finding that providers have no right to a pre-termination hearing are persuasive. In *Mathews v. Eldridge*, the Supreme Court identified three factors relevant to procedural due process claims:

> (1) the private interest that will be affected by the official action;
>
> (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and
>
> (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 334–35 (1976). Each of these factors weighs against Plaintiff.

"First, the 'private interest that will be affected by the official action' is simply not compelling," because healthcare providers are not the "intended beneficiaries" of Medicare. *GOS*

16

*Operator*, 843 F. Supp. 2d at 1234. Rather, Plaintiff's "interest in being subsidized under that program 'is only incidental to the purpose and design of the [Medicare] program.'" *Id.* (alteration in original) (quoting *Cathedral Rock of N. Coll. Hill, Inc. v. Shalala*, 223 F.3d 354, 365 (6th Cir. 2000)).

Second, the risk of erroneous deprivation is fairly low. "A termination decision is well-documented and typically is based on survey reports from unbiased health professionals who apply well-defined criteria developed through the administrative process; the provider has the opportunity to submit written material in response to the survey findings so that a hearing likely is not necessary for the provider to present its position." *Autumn Health Care of Zanesville, Inc. v. U.S. Dep't of Health & Human Servs.*, 959 F. Supp. 2d 1044, 1052 (S.D. Ohio 2013) (quoting *Cathedral Rock*, 223 F.3d at 365); *GOS Operator*, 843 F. Supp. 2d at 1234 (noting site visits by neutral inspectors, written reports of every survey, exit interviews with surveyors, and opportunities to submit written materials).

Plaintiff claims that there is "**no process** for review of survey findings before a termination goes into effect." ECF No. 1 at 15 (emphasis in original). But it could presumably be heard during the surveys, and Plaintiff acknowledged that at least one of its surveys ended with an "exit conference." ECF No. 1 at 19. Plaintiff also had the opportunity to provide remediation plans and received a follow-up survey before the termination decision was made final.

In many cases finding no right to a pre-termination hearing, the providers "had at least some opportunity to respond to the [defendants'] findings." *Symphony Hospice*, 2025 WL 3050054, at *5. Plaintiff argues that it received no such opportunity after the surveys and exit conference. ECF No. 7-1 at 30. But in light of the interests involved and of the process that Plaintiff did receive, the risk of erroneous deprivation is still relatively low.

Finally, "the government has a high interest in not conducting pre-deprivation hearings." *Native Angels Home Health, Inc. v. Burwell*, 123 F. Supp. 3d 775, 778 (E.D.N.C. 2015). For one thing, the government's "responsibility for insuring [sic] the safety and care of elderly and disabled Medicare patients is of primary importance." *Autumn Health Care*, 959 F. Supp. 2d at 1052; *Blue Valley Hosp.*, 322 F. Supp. 3d at 1168 ("[T]he government interest in protecting patients through an expeditious provider-termination procedure is quite strong."). And second, "the government has a strong interest in minimizing the expenses of administering the Medicare program." *Autumn Health Care*, 959 F. Supp. 2d at 1052.

Plaintiff argues that the government's interest is diminished here because: Plaintiff disputes that any deficiencies constitute immediate jeopardy, Plaintiff was found in compliance as recently as January, Plaintiff's patient satisfaction results are not bad, and Plaintiff has implemented significant improvements to try to address the concerns Defendants identified. ECF No. 7-1 at 33. But these considerations largely go to the merits of the termination decision in this case, so considering them in detail would raise jurisdictional concerns under the channeling provision discussed above.

Plaintiff has not shown a substantial likelihood of success on the merits, because—at least on the current record—it would likely fail *Mathews* balancing.

### B. Due-Process-Protected Interest

Plaintiff also does not have a due-process protected property or liberty interest in its continued participation in Medicare.

*Shah v. Azar* held that, "[b]ecause health care providers 'are not the intended beneficiaries of the federal health care programs . . . [,] they . . . do not have a property interest in continued participation or reimbursement.'" 920 F.3d 987, 997–98 (5th Cir. 2019). *Shah* involved a takings

18

claim, but it cited due process caselaw for this proposition. *See id.*; *Parrino v. Price*, 869 F.3d 392, 398 (6th Cir. 2017); *Erickson v. U.S. ex rel. Dep't of Health & Human Servs.*, 67 F.3d 858, 862 (9th Cir. 1995); *Koerpel v. Heckler*, 797 F.2d 858, 863–65 (10th Cir. 1986); *Cervoni v. Sec'y of Health, Educ. & Welfare*, 581 F.2d 1010, 1019 (1st Cir. 1978).

Also, the plaintiffs in *Shah* were individual physicians, as opposed to a hospital. But the same logic applies; hospitals "are not the intended beneficiaries of the federal health care programs." *Shah*, 920 F.3d at 997–98. So Plaintiff does not have a due-process-protected property interest in continued participation in Medicare.

Plaintiff argues that it has recently spent $10 million on improvements and remediation measures in reliance on continued Medicare approval. ECF No. 7-1 at 31–32. But most facilities who comply with the extensive requirements for Medicare approval have presumably spent money to do so. Yet the precedent cited above does not differentiate between providers who have invested substantial sums in their Medicare approval and those few (if any) who have not.

Plaintiff also asserts a protected liberty interest under a "stigma-plus" theory. ECF No. 7-1 at 30–31. "To show a due process violation under this theory, 'a . . . plaintiff [must] show stigma plus an infringement of some other interest.'" *Does 1-7 v. Abbott*, 945 F.3d 307, 313 (5th Cir. 2019). The Fifth Circuit has "found sufficient stigma only where a state actor has made concrete, *false* assertions of *wrongdoing on the part of the plaintiff*." *Id.* (emphasis in original). And "for a charge to be stigmatizing it must be worse than merely adverse; it must be such as would give rise to a badge of infamy, public scorn, or the like." *Blackburn v. City of Marshall*, 42 F.3d 925, 936 (5th Cir. 1995) (quotation marks omitted).

Defendants posted a public notice that Plaintiff's Medicare approval was being terminated based on a failure to substantially comply with Medicare and Medicaid health and safety

19

participation requirements. ECF No. 1 at 21. The notice (available at https://www.cms.gov/files/document/454060-laurel-ridge-treatment-center-04-15-26-pdf.pdf) is cursory, and Plaintiff does not explain how it is a "badge of infamy, public scorn, or the like." Instead, Plaintiff simply says Defendants' accusations are "plainly stigmatizing." ECF No. 7-1 at 31.

Plaintiff has thus not established that it is likely to show a liberty or property interest protected by the Due Process Clause. Because Plaintiff has not shown a substantial likelihood of success on the merits, it is not entitled to a TRO or preliminary injunction.

b.  Balance of Harms and Public Interest

Plaintiff must also show that the threatened injury outweighs any harm that may result to the non-movant and that the injunction will not undermine the public interest. *Valley*, 118 F.3d 1047, 1051 (5th Cir. 1997). These factors "merge when the Government is the opposing party." *Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 643 (5th Cir. 2023).

The threatened injuries to Plaintiff are significant. It might go out of business, and its patients and employees could lose healthcare and employment respectively. For context, Plaintiff points out that its closure would reduce the number of inpatient psychiatric beds in San Antonio by nearly 40%. ECF No. 7-1 at 37.

But Plaintiff has not shown that this outweighs the harm that would result from the injunction it requests. As noted above, the primary interest here is protecting patients, and surveyors found Plaintiff to have deficiencies placing patients in "immediate jeopardy." Plaintiff alleges that Defendants' administrative-review proceedings take years. So the requested injunction would allow Plaintiff to continue operating in a manner that allegedly places patients in

jeopardy for *years*. Plaintiff has not shown that it closing would outweigh that harm; in fact, Plaintiff has not meaningfully explained the deficiencies Defendants allege at all.

For similar reasons, Plaintiff has not shown that a TRO or preliminary injunction will not undermine the public interest. Beyond the concern about Plaintiff continuing to operate with potential major deficiencies, there is a public interest in ensuring that Medicare funds go only to qualified providers.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Exceed Page Limit (ECF No. 7) is **GRANTED**, and Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction (ECF No. 7-1) is **DENIED.**

SIGNED this 28th day of April, 2026.

_____
JASON  PULLIAM
UNITED STATES DISTRICT JUDGE